MEINZE, ADMX., APPELLANT, *v.* HOLMES ET AL.; TEACHERS INSURANCE AND ANNUITY ASSOCIATION, APPELLEE.

144

(No. C-860459—Decided
July 29, 1987.)

*William C. Knapp,* for appellant.
*Porter, Wright, Morris & Arthur* and *Louis J. Schneider, Jr.,* for appellee.

BLACK, P.J. The dispositive question in this case is whether the insurer of disability benefits fulfilled or violated a duty to disclose a medical opinion that the insured's medical treatment for heart disease was inadequate, when that opinion came to the insurer's attention by reason of medical examinations it arranged for the insured in connection with the payment of disability benefits. We hold that, under the circumstances revealed by the record, that duty was fulfilled.

I

William Meinze was employed as a maintenance pipefitter and plumber by Northern Kentucky University and suffered a heart attack on April 22, 1982. He was hospitalized by his treating physician, Dr. Glenn J. Bichlmeir. On June 11, 1982, a coronary arteriography was performed by a cardiologist, Dr. John C. Holmes, who initially concluded that Meinze had advanced three-vessel coronary artery disease with poor left ventricular function. However, the arteriography results were read by a radiologist, Dr. Harold Margolin, who concluded that Meinze did not have a serious coronary artery disease but a partial blockage. Holmes acceded to this opinion, did not recommend corrective surgery, and prescribed a relatively minor regime of treatment.

On August 5, 1982, Meinze applied for disability benefits from the Teachers Insurance and Annuity Association ("TIAA") claiming he was totally disabled. Under the disability policy covering the University's employees, TIAA required Meinze to apply for Social Security benefits because those payments would reduce the amounts contractually payable by TIAA. Meinze's applications to the Social Security Administration were twice rejected. After each rejection, TIAA arranged for Meinze to be examined by two independent medical consultants whom it engaged for this purpose. The first examination was performed by Dr. Allen Cornish who sent TIAA a report dated January 7, 1983, and the second examination was by Dr. Robert Adolph whose report was dated June 27, 1983. Each consultant stated in his respective report to TIAA that in his opinion the treatment prescribed was either questionable or

inadequate, but each stated this only to TIAA because under the arrangement, the consulting physicians were required to deliver their reports only to TIAA and to no other person.

Cornish felt that Margolin's reading of the "cardiac catheterization" was inconsistent with the other indications, and he stated this in his report of January 7, 1983, as follows:

"There certainly is a discrepancy in the description of his cardiac catheterization results between the initial evaluation and the review of his cines. I think it would be of benefit to have the cathing doctor review the films again. Certainly the initial impression fits more with the EKG findings and Mr. Meinze's symptoms. .

"* * *

"It certainly would be difficult to predict how well his symptoms would respond to more aggressive medical management, however, I think he will need to avoid heavy physical exertion in the future. This certainly may limit his ability to perform his duties as power plant operator since climbing and heavy lifting are involved.

"In summary, I feel that Mr. Meinze's [sic] must be assumed to have class III angina pectoris. His physical activity should be significantly restricted at this time. He may improve with more aggressive medical therapy, but still would need to be under restrictions from heavy lifting and vigorous physical exercise. There is a discrepancy in his cardiac catheterization report and I feel that a review of his films would be helpful in assessing his overall prognosis."

Dr. Adolph stated in his report of June 27, 1983:

"His medical management is inadequate insofaras [sic] he is not taking either nitrates and/or a calcium channel blocker. He has hypertension, which is poorly controlled on the beta-blocker alone. He is at considerable risk for developing another acute myocardial infarction. In view of the finding of three-vessel disease and because of the persistence of his symptoms of angina. [Sic.] His is a candidate for coronary artery bypass grafting by usual criteria.

"* * *

"I believe that his symptoms are real and that he is totally disabled by virtue of the disease mentioned above. His physical activities should be significantly restricted and rehabilitation to gainful employment could only be considered following more aggressive medical management and coronary artery bypass surgery." (Emphasis sic.)

TIAA's medical director, Dr. Oscar Garfein, thought that Holmes's angiogram should be reviewed, that Meinze's condition was "rather serious," but that he was not at considerable risk.

At Meinze's written request, a copy of Cornish's report was delivered to Meinze's attorney, Deborah F. Webb, on April 18, 1983, and a copy of Adolph's report was delivered to her on September 13, 1983. These deliveries are uncontroverted. Webb used these copies to pursue Meinze's reapplications for Social Security benefits, and they were entered in the record of these proceedings. Webb talked to Bichlmeier for an hour on May 6, 1983, about the Cornish report. Meinze's family had a copy of Adolph's report when he was admitted to Park West Hospital in Knoxville, Tennessee, on January 1, 1984. The family was traveling through that city between Cincinnati and Florida when Meinze suffered another heart attack. This one was fatal, and he died in the hospital on January 5, 1984.

II

Meinze's administratrix brought suit against the cardiologist, the

radiologist and TIAA, claiming malpractice by the physicians and both a negligent violation and an intentional violation by TIAA of a duty to disclose the inadequacy of Meinze's treatment. The malpractice and the failure to disclose were alleged to have caused Meinze's death. The two physicians settled the respective claims against them and were dismissed from the case. TIAA filed a motion for summary judgment that was supported by affidavits, answers to interrogatories and depositions. The trial court granted TIAA's motion without filing an opinion, and the administratrix appealed.

In the first of two assignments of error, appellant asserts that the trial court erred in ruling that as a matter of law TIAA had no duty to inform Meinze about his serious medical condition, and in the second, that the trial court erred in holding that the furnishing of the Cornish and Adolph reports fulfilled TIAA's duty to inform. We find no merit in either assignment of error.

### III

The first assignment of error has no merit because the record fails to substantiate it. The record does not demonstrate that the court made a specific holding that an insurer has no duty whatsoever to disclose significant medical information. The trial court's entry granting TIAA's motion for summary judgment states no more than that there were no genuine issues of material fact and that TIAA was entitled to a judgment as a matter of law. The court did not state its reasons for granting the motion, and as will be explained below, there are two other possible reasons for its judgment in addition to the absence of a duty to disclose.

### IV

The second assignment of error has no merit, in our judgment, for two reasons. The first is that on the basis that a disability insurer has, under some circumstances, a duty to inform the insured about significant medical information it acquires by reason of examination of the insured's person and his medical files (see Part A below), that duty was fulfilled in this case when the insurer sent copies of the pertinent reports to the insured's attorney. The second reason is that the appellant failed to establish another essential element of her claim for damages; that is, she failed to establish the causal connection between the failure to disclose (if any) and the death.

### A

Returning to the first reason, we examine appellant's arguments that because TIAA constrained Cornish and Adolph to report their opinions only to itself, TIAA assumed the duties incumbent on the physicians, and that under the circumstances, this duty was to disclose directly and personally to Meinze the opinion that his treatment was inadequate. Appellant bases this duty on an analogy to the duty of an employer to disclose to an employee, prior to or during employment, information the employer acquires when a physician it engaged discovers a serious medical problem while examining the employee in accordance with the employer's requirements. Annotation (1960), 69 A.L.R. 2d 1213.

The employer's duty has been held to arise at common law under three different theories:

"* * *(1) Even in the absence of a doctor-patient relationship, a doctor who assumes to act must act carefully with respect to all aspects of the examination; (2) where a doctor acts primarily for the benefit of an employer in examining a prospective employee, the doctor must act carefully with respect to all aspects of the examination; (3) where a doctor-patient relationship ex-

ists, the doctor must act with care. * * *" *Betesh* v. *United States* (D.D.C. 1974), 400 F. Supp. 238, 245.

The first theory of assumed responsibility could be applied outside the employer-employee relationship, and conceivably could be applied to the insurer-insured relationship, because it arises even though no doctor-patient relationship has been created.

The second and third theories are not applicable in this case. The second theory is grounded on an employer's duty to warn an employee of a "hidden" danger or risk. *Union Carbide & Carbon Corp.* v. *Stapleton* (C.A.6, 1956), 237 F. 2d 229. It is not transferable to an insurer, because the insurer does not owe the same duty of safety to its insureds that an employer owes to its employees. The third theory can be applied only when the examining physician undertakes an ongoing relationship with the examined person based on mutual consent, thus creating a doctor-patient relationship when there was none in the first instance. No such consensual, ongoing relationship arose in the instant case. Cornish and Adolph had only one consultation each with Meinze.

We are unwilling to hold, as TIAA would have us hold, that an insurer's physician has no duty under any circumstances to disclose to the insured a newly discovered significant medical risk or danger unknown to the insured. On the other hand, we are also unwilling to hold, as appellant would have us hold, that the duty arises and includes an obligation to intervene directly with the insured whenever the examining physician opines that the treatment is inadequate, or presumably whenever the examining physician thinks there are better ways to treat the particular medical condition.

The record does not contain any expert evidence that will assist us in determining what sort of circum-

stances will create a duty to disclose, what is the extent of that duty, and what actions will fulfill it. The deposed physicians in this case suggest that there may conceivably be situations in which a physician should disclose vital medical information, but the operative factors in those situations are not clear. We are, therefore, unwilling to develop a comprehensive statement of the duty to disclose beyond the requirements of this appeal. Because the determinative fact in this case is that the opinions of the examining physicians were communicated to the insured, we need only determine whether the duty of reasonable care under the circumstances before us was fulfilled by that delivery.

The duty to disclose will arise under circumstances when a reasonable physician of ordinary skill and diligence would disclose a significant risk or danger to the person being examined, even though the doctor-patient relationship does not exist. The risk or danger may arise from the inadequacy of the treatment as well as from the patient's condition. This duty arises because the physician has examined the insured personally or has reviewed his confidential medical records, and he has thus assumed a professional and expert position with respect to the insured's physical condition and well-being, even though a doctor-patient relationship has not been created.

What is the extent of the duty? We turn to the analogous employer-employee relationship. In *Union Carbide, supra,* the duty to disclose arose because the examined person was unaware of the newly discovered medical risk, and the examining physician knew he was not aware. In the instant case, Meinze was fully aware of his heart disease and he was under treatment by his own physician on a regular basis. The risk was not unknown.

Bichlmeir and Holmes knew Meinze had a three-vessel coronary artery disease with left ventricular dysfunction. The information of which Meinze was not aware, initially, was that at least one of the examining physicians (Adolph) thought his treatment was inadequate and he was at considerable risk. But there was a difference of opinion about the adequacy of his treatment. Garfein did not view the risk as being "considerable." Cornish's opinion was expressed in veiled terms; he even said he was not sure of the benefits of a more aggressive treatment. The record does not present a situation in which there was agreement among TIAA's physicians that there was an immediate threat to Meinze's life that was either unknown to or ignored by his treating physicians.

Under these circumstances, we believe the extent of the duty to disclose was to communicate the opinions of the examining physicians about the quality of treatment either to the treating physician or to the patient-insured. We reject appellant's argument that under the circumstances of this case, the duty of the examining physicians was to intervene by stepping between the treating physician and the patient-insured to explain in detail the adverse opinions and to prescribe or advise a different or more aggressive treatment.

We hold that TIAA fulfilled its duty to communicate when, at Meinze's specific request, it delivered copies of the Cornish and Adolph reports to Meinze's attorney on April 18, 1983, and on September 13, 1983, respectively. The operative information in those two reports (as opposed to the technical analysis of the experts' examinations and tests) was stated in plain, understandable terms. The delivery to Meinze's attorney was, in our judgment, functionally equivalent to delivery either to Meinze or to his treating physician.

In sum, the record demonstrating that TIAA fulfilled its duty to disclose opinions that the treatment was or might be inadequate, TIAA is entitled to judgment as a matter of law.

B

The second reason that the trial court did not err in granting summary judgment to TIAA is that appellant failed to establish another essential element in addition to the violation of a duty to disclose; that is, the essential element of causation of Meinze's death, suffering or other deprivation by the alleged failure to disclose. Appellant alleged in her petition that TIAA's defalcation caused Meinze great physical and mental pain and suffering, caused his total disability and deprived him of his future earning capacity. The record, however, contains no evidentiary documentation of what pain and suffering was caused by the failure to disclose and of how Meinze's death or loss of earning was caused by that failure.

As the movant, TIAA had the duty to demonstrate to the court that it was entitled to judgment as a matter of law because there was no genuine issue about any material fact. One of TIAA's arguments was that causation was not demonstrated.

In *Celotex Corp.* v. *Catrett* (1986), 477 U.S. 317, the manufacturer of an asbestos product won a summary judgment under Fed. R. Civ. P. 56(c) and (e) on the basis that the claimant was unable to produce evidence that the decedent has been exposed to the manufacturer's products. The Supreme Court held that even though the moving party has the burden to demonstrate that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law, the moving party does not have to produce

evidence *negating* the opponent's claim. The court said at 477 U.S. at 322-323:

"In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. * * *"

In the instant case, there was clearly adequate time for discovery. The first amended complaint was filed by leave on June 24, 1985, the motion for summary judgment was filed January 10, 1986, the depositions and affidavits of all persons with knowledge of TIAA's activities were filed, and the summary judgment was rendered on July 3, 1986. Appellant could not rely on the unsworn allegations of her complaint. Civ. R. 56(E).

## V

Finding that there was no genuine issue of any material fact that the TIAA was entitled to judgment as a matter of law, we affirm the summary judgment below.

*Judgment affirmed.*

DOAN, J., concurs.

UTZ, J., not participating.